**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SHERRY L. B.,[1]<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>ANDREW SAUL, Commissioner of Social Security,<br><br>　　　　Defendant. | Case No. CV 19-07317-RAO<br><br>**MEMORANDUM OPINION AND ORDER** |

## I.　INTRODUCTION

Plaintiff Sherry L. B. ("Plaintiff") challenges the Commissioner ("Defendant")'s denial of her applications for disability insurance benefits ("DIB"), and supplemental security income ("SSI"). For the reasons set forth below, the Defendant's decision is REVERSED, and the matter is REMANDED.

## II.　SUMMARY OF PROCEEDINGS

In June and July 2015, Plaintiff applied for DIB and SSI, alleging that she had been disabled since May 1, 2008, due to bipolar disorder, arthritis, seizures,

---

[1] Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

migraines, and Post-Traumatic Stress Disorder ("PTSD"). (Administrative Record ("AR") 391-401, 442.) Her applications were denied and she requested and was granted a hearing before an Administrative Law Judge ("ALJ"). (AR 177-81.) Following a hearing in September 2018, the ALJ found that Plaintiff had not been disabled at any time through the date of decision. (AR 52, 125-54, 183-84.)

The ALJ applied the five-step sequential evaluation set forth in the governing regulations. *See Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995). At step two, the ALJ found that Plaintiff's affective disorder, anxiety disorder, seizure disorder, cervical spine degenerative disc disease, and thoracic spine disc displacement were severe impairments. (AR 40.) At step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to "perform medium work . . . except and as seizure precautions, she should never climb ladders, ropes and scaffolds or operate motorized vehicles. [Plaintiff] should avoid traversing slippery or uneven terrain and working at unprotected heights. In addition, [Plaintiff] can perform simple, repetitive tasks." (AR 42.) The ALJ concluded that Plaintiff was capable of performing her past relevant work as a cashier. (AR 50.) Accordingly, the ALJ determined that Plaintiff had not been under a disability from May 1, 2008 through the date of the decision. (AR 52.)

The Appeals Council denied Plaintiff's request for review. (AR 1-4.) This action followed. (Dkt. No. 1.)

### III. DISCUSSION

#### A. The ALJ Did Not Provide Clear and Convincing Reasons for Rejecting the Mental Limitations Assessed by the Treating Psychologist

Plaintiff contends that the ALJ failed to provide clear and convincing reasons for rejecting the mental limitations assessed by her treating psychologist, Maxine R. Day. (JS 4-11, 16-20.) The Court agrees.

The ALJ is responsible for assessing a claimant's RFC "based on all of the relevant medical and other evidence." 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c); *see*

*Robbins v. Social Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) (citing SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996)). In doing so, the ALJ may consider any statements provided by medical sources, including statements that are not based on formal medical examinations. *See* 20 C.F.R. §§ 404.1513(a), 404.1545(a)(3). An ALJ's determination of a claimant's RFC must be affirmed "if the ALJ applied the proper legal standard and his decision is supported by substantial evidence." *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005).

Courts give varying degrees of deference to medical opinions based on the provider: (1) treating physicians who examine and treat; (2) examining physicians who examine, but do not treat; and (3) non-examining physicians who do not examine or treat. *Valentine v. Comm'r, Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009). Most often, the opinion of a treating physician is given greater weight than the opinion of a non-treating physician, and the opinion of an examining physician is given greater weight than the opinion of a non-examining physician. *See Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). The ALJ must provide "clear and convincing" reasons to reject the uncontroverted opinion of a treating physician. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988); *Lester*, 81 F.3d at 830-31. Even if a treating doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it for "specific and legitimate reasons that are supported by substantial evidence" in the record. *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017), *as amended* (Sept. 14, 2017), (citing *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)).

The medical record shows that Dr. Day initially examined Plaintiff on November 26, 2014 and, thereafter, saw her once per month through March 11, 2015. (AR 899-901.) On June 29, 2015, Dr. Day completed an Evaluation Form for Mental Disorders, covering her several months of treating Plaintiff. (AR 896-900.)

In that evaluation, Dr. Day noted that although Plaintiff could be an "inconsistent historian," she presented with an extensive history of domestic violence

and abuse from partners, family, and neighbors. (AR 896, 897.) Dr. Day reported that Plaintiff's appearance was appropriate and casual but that her hygiene ranged from normal to disheveled and dirty. (AR 896.) Dr. Day reported that Plaintiff at times would appear "fearful, psychotic, suspicious, anxious and guarded" and had difficulty being around people. (*Id.*) Plaintiff herself reported symptoms of "depressed mood, panic attacks, shortness of breath, racing thoughts, paranoia, 'people can read [her] thoughts,' [p]osttraumatic [s]tress, flashbacks, increased/decreased sleep, increased/decreased appetite, [and] period of high energy." (*Id.*) She also reported "cognitive distortions about others' perception about her behavior and intentions." (AR 897.) She told Dr. Day she was homeless and living in a car with a friend but refused to go to a shelter. (*Id.*)

Dr. Day found that Plaintiff was anxious, hyper-verbal, disoriented, disorganized, and lacking boundaries. (*Id.*) She noted that Plaintiff was impulsive and did not think about the consequences of her behavior and that she was generally distrustful of people and situations. (*Id.*) Further, Dr. Day observed that Plaintiff displayed symptoms of "depression, anxiety, paranoia, suspicious, distrustful, mania, hyper-verbal, flight of ideas, increased/decreased appetite, increased/decreased sleep, racing thoughts, flashbacks, ruminates, auditory hallucinations and visual hallucinations." (*Id.*) Plaintiff "presented with depression, anxiety, paranoia, emotional lability, disorganized, confused, and impaired judgment[,] . . . [and] appears to get overwhelmed and reactive to situations." (AR 898.) Dr. Day acknowledged that Plaintiff had not undergone formal testing but nevertheless opined that she had some "intellectual difficulties" and impairment in both her memory and judgment. (AR 897.)

As for Plaintiff's ability to function, Dr. Day opined that she would be limited in numerous aspects. Dr. Day observed that in her daily activities Plaintiff seemed to be able to "do shopping," but relied on other people to give her rides,

//

preferred the company of strangers to those she knew and demonstrated "poor judgment in her assessment of people and situations." (AR 898.)

Dr. Day opined that Plaintiff's memory was impaired in reporting events and in showing up to scheduled appointments. (AR 897.) Dr. Day noted that Plaintiff "seems to have difficulty communicating her thoughts and feelings to others." (AR 898.) As to Plaintiff's concentration and task completion, Dr. Day found Plaintiff was "capable of making appointments, but experiences difficulty in keeping track of when they [sic] and show up for them." (*Id*.) Plaintiff appeared to understand simple oral instructions, though Dr. Day did not know about her ability to comprehend writing, but Dr. Day noted that "[i]f instructions are [too] detailed or vague for [her] she gets confused, anxious and overwhelmed." (*Id.*) Dr. Day further noted that Plaintiff "appears to understand simple instructions in the moment, but she is not able to remember them for long." (*Id.*)

With respect to Plaintiff's ability to adapt to work or work-life situations, Dr. Day opined that Plaintiff did not do well under stressful conditions in her daily life. (AR 899.) Additionally, Dr. Day opined that Plaintiff would have "difficulty with authority figures, getting along with others and taking personal responsibility for her behavior." (*Id.*) Dr. Day concluded that Plaintiff did not "appear to have the ability to maintain employment at this time." (*Id*.)

Dr. Day diagnosed Plaintiff with Bipolar Disorder, most recent mixed severe with psychotic features; Posttraumatic Stress Disorder; and Borderline Personality Disorder. (*Id*.) She indicated that Plaintiff could be expected to improve with "medication compliance, ongoing therapy, and commitment to improve," but determined that her prognosis would be "guarded" for two years. (*Id.*)

As an initial matter, Plaintiff contends that the ALJ erred in failing to recognize the weight due the treating doctor's opinion.[2] (JS 5.) The Court agrees. The record

---

[2] Plaintiff also points to medical records that she submitted to the Appeals Council. (JS 9.) The Appeals Council did not consider the record because Plaintiff failed to

5

makes clear that Dr. Day was Plaintiff's treating psychologist. *See* 20 C.F.R. § 404.1527 ("Treating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."). Dr. Day examined Plaintiff for the first time on November 26, 2014 and saw Plaintiff an average of once per month. (AR 899-900, 901-09.) Additionally, in a June 17, 2016 letter, Dr. Day stated that Plaintiff was her client and had been her client since November 26, 2014. (AR 1253.) Furthermore, Dr. Day's opinion is not contradicted by any other medical source in the record.[3] Accordingly, the ALJ was required to provide clear and convincing reasons for discounting Dr. Day's opinion. *See Embrey*, 849 F.2d at 422.

The ALJ recited many of Dr. Day's findings, but gave her conclusions little weight on the ground that her opinion was "not supported by [Plaintiff's] mental health treatment records that show that with proper compliance, the claimant's mental conditions have substantially improved." (AR 50, *citing* AR 949-1056). The ALJ's rejection of Dr. Day's opinion on this ground was error.

Although inconsistencies between a doctor's evaluation and her treating notes constitute a clear and convincing reason for rejecting the doctor's opinion, *see Bayliss*, 427 F.3d at 1216 (holding discrepancy between doctor's opinion and his own

---

show a reasonable probability that they would have resulted in a different outcome. (AR 2.) Because Plaintiff failed to make an argument in this Court regarding this additional evidence, the evidence will not be considered. *See*, *e.g.*, *Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) (affirming court reviews "only issues which are argued specifically and distinctly."); *see also United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) ("Arguments made in passing and not supported by citations to the record or to case authority are generally deemed waived").

[3] In August 2015, reviewing psychologist Dr. Meyers noted Dr. Day's opinion but concluded that Plaintiff's failure to attend scheduled examinations meant that there was insufficient evidence in the file to make a mental impairment evaluation. (AR 161.) Notably, Dr. Meyers provided no justification for rejecting Dr. Day's evaluation.

6

contemporaneous observations was clear and convincing reason for not relying on the opinion), the record does not support the ALJ's finding here.

In July 2015, Dr. Day found that Plaintiff's condition was significantly impaired, as set forth above. In the following years, other medical providers evaluated Plaintiff, with varying results. Thus, in March 2015, Dr. Demandante noted largely unremarkable findings on Plaintiff's mental status examination. (AR 911.) In June and August 2016, Nurse Epstein noted that Plaintiff was calm and her judgment and insight were "improving." (AR 996, 999.) In June 2018, Dr. Balcos found that Plaintiff's appearance, speech, judgment/insight, and thoughts were likewise unremarkable. (AR 67-68.) At the same time, Dr. Balcos noted that Plaintiff's affect was constricted and found that she was on the "bipolar spectrum." (*See* AR 64, 67-68 (June 28, 2018).)[4]

On other occasions between December 2014 and January 2018, however, Plaintiff appeared significantly more impaired. (*See* AR 911, 928, 931, 965, 970.) In August 2017, for example, Nurse Epstein noted that Plaintiff's affect was sad, her judgment and insight were limited, her mood was labile, and she displayed psychotic symptoms. (AR 976.) In March 2018, Nurse Epstein made similar findings. (AR 965.) A fair reading of the record, therefore, shows that Plaintiff's condition continued to fluctuate, a finding not inconsistent with Dr. Day's opinion in June 2015 that Plaintiff's condition could improve if she remained compliant with her medication, received ongoing therapy, and made a commitment to improve. (AR 899.) The ALJ was not permitted to rely on this record to reject the treating

---

[4] Defendant contends that "[t]he ALJ noted other providers observed Plaintiff as alert, cooperative and oriented X 3." (JS 15.) Most of the cited providers, however, were treating Plaintiff for physical or neurological complaints and seemingly did not know of or have access to Plaintiff's mental health history. (*See* AR 802, 818, 841, 1057, 1108, 1176, 1199, 1277, 1283, 1286.) One of the few exceptions is Plaintiff's visit to the emergency room in June 2015, on which date she was expressing suicidal ideations. (AR 875.) That page of the record does not support Defendant's argument.

psychologist's opinion. *See Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001) (holding ALJ could not reject treating doctor's opinion based on selective reading of treatment notes). Because the ALJ assigned Dr. Day's treating opinion little weight while failing to provide a legitimate explanation for doing so, the decision was in error. *See Garrison*, 759 F.3d at 1012-13.[5] Accordingly, remand is warranted on this issue.

### B. The ALJ Did Not Provide Clear and Convincing Reasons for Rejecting Plaintiff's Subjective Symptom Testimony

Plaintiff contends that the ALJ failed to provide clear and convincing reasons for rejecting her complaints regarding her pain and limitations. For the following reasons, the Court concludes that remand is warranted on this ground, too.

Where, as here, the claimant has presented evidence of an underlying impairment and the ALJ did not make a finding of malingering (*see* AR 43), the ALJ must "evaluate the intensity and persistence of [the] individual's symptoms . . . and determine the extent to which [those] symptoms limit [his] . . . ability to perform work-related activities." Soc. Sec. Ruling ("SSR") 16-3p, 2017 WL 5180304, at *4. In assessing the intensity and persistence of symptoms, the ALJ "examine[s] the entire case record, including the objective medical evidence; an individual's statements . . . ; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4. The ALJ must provide specific, clear and convincing reasons for rejecting the claimant's statements. *Trevizo*, 871 F.3d at 678 (citation omitted). The ALJ must identify what testimony was found not credible and explain what evidence

//

---

[5] To the extent the ALJ rejected Dr. Day's opinion on the ground that "the record lacks any opinion from [Plaintiff's] treating doctor regarding [her] functional limitations showing that [she] is more limited than determined by the decision[,]" (AR 50), that justification is belied by Dr. Day's evaluation and the functional limitations set forth therein. (AR 896-900.)

undermines that testimony. *Holohan*, 246 F.3d at 1208. "General findings are insufficient." *Lester*, 81 F.3d at 834.

Plaintiff testified that she previously worked as a waitress but stopped because of a spinal injury. (AR 128, 132, 133.) She testified that she has PTSD and "[s]ometimes things trigger." (AR 135; *see* AR 136.) She has PTSD moments, including an incident where she had her purse stolen, after which she laid down and cried for three hours without being able to move. (AR 135-36.) She became paralyzed in fear, could not return to the site of the theft until months later, and could not be around crowds or people. (AR 136.) Plaintiff reported that she is receiving treatment for her PTSD and explained that her PTSD "is not the kind of thing [she] can deal with by [herself]." (AR 137.) However, she stopped going to San Pedro Mental Health because they cannot see her as often as she feels is needed. (AR 137-38.) Plaintiff reported that she would benefit most from one-on-one therapy. (AR 138.)

Plaintiff explained that she is taking lithium. (AR 139.) However, Plaintiff reported that she cannot "take it the correct way at night because [she is] not indoors." (*Id.*) She feels vulnerable to medication that "knocks [her] out cold, because [she is] on the streets." (AR 139.) Plaintiff reported that she takes medication, but the medication works the opposite for her. (AR 140.) Plaintiff takes, or has taken, Celexa, Klonopin, and Trokendi. (*Id.*)

Plaintiff also reported experiencing migraines. (AR 140.) She explained that the previous migraine she had "was kicking pretty good," but that was because she missed her appointment with a pain specialist, either because she was busy at another appointment or the bus did not pick her up. (AR 140, 141.) She has received Botox injections in her head, neck, and shoulders to help with the migraines. (AR 143.) Plaintiff's last appointment was one or two weeks prior to the hearing. (*Id.*) Plaintiff does not want to have surgery because once she has surgery on something, "then

eventually they have to fix this piece, and then this piece, and this piece. And by the time you kick the bucket you're stuck with this for the rest of your life." (AR 144.)

When asked if her condition included times where she was calm and times when she had "a lot of anxiety and racing thoughts," she responded in the affirmative. (AR 141-42.) She explained that there are times when her condition is worse and depends on if she has been able to sleep and has all her medications. (AR 142.) When her purse was stolen, she did not have any medication and had to wait a month without the medication. (*Id.*)

When questioned about the appointments with social security doctors that she missed, Plaintiff explained that she did not know about them. (AR 144.) She also explained that one appointment was set during the hottest part of the day and she tried to schedule it earlier or later because during that hottest part of the day she either needs a ride or would get lost because it involves taking more than two buses. (*Id.*) Plaintiff explained that during the hottest part of the day she feels like the sun gets to her and her blood is boiling. (*Id.*) She reported that she feels like her brain is cooking and she does not have any senses. (AR 144-45.) Plaintiff gets disoriented. (AR 145.) She does not know if it is a result of her medication. (*Id.*) The ALJ noted that she would reschedule the consultative examination. (AR 145.)

Plaintiff uses a bus for transportation and uses a car service when she has money. (AR 130-31.) Plaintiff spends a lot of time at doctors' appointments. (AR 131.) She explained that she spends a lot of time near a coffee shop with friends. (*Id.*) She walks around the area with her friends and talks. (*Id.*) She reported that she was planning to go to a free event in the park, because she did not have to worry about money or stress and her puppy could play in the park. (*Id.*)

The ALJ gave little weight to Plaintiff's testimony regarding her symptoms. (AR 43, 50.) Specifically, the ALJ found that Plaintiff's testimony was: (1) exaggerated and "motivated largely by secondary gain factors"; and (2) inconsistent

with her activities of daily living and her use of marijuana.[6] (AR 50.) The ALJ found that "the record indicates that she is capable of [a] wide range of activities of daily living as she lives on her own and takes care of herself." (*Id.*, citing AR 898.) Additionally, the ALJ relied on Plaintiff's ability to go to appointments on her own and her ability to establish good relationships with her medical providers. (AR 50.) The ALJ also observed that Plaintiff "spends the entire day with her friends outside" and "abuses marijuana daily." (*Id.*) The ALJ reasoned that the "discrepancies and inconsistencies do not support [Plaintiff'] ultimate allegation of disability." (*Id.*) The ALJ's reasons for discounting Plaintiff's credibility do not withstand close scrutiny.

First, the ALJ's unsupported finding that Plaintiff's testimony was exaggerated for financial gain, without more, cannot support an adverse credibility determination. *See Irwin v. Astrue*, 2011 WL 2619503, at *5 (D. Or. July 1, 2011) ("Obviously, every social security claimant is motivated to some degree by the prospect of gain, so an adverse credibility finding must rest on more than the mere fact that a claimant is pursuing a claim") (quotation omitted).

As for the ALJ's second justification, generally speaking an ALJ may use inconsistencies between a claimant's testimony and their other statements, conduct, and daily activities as a basis for discounting their testimony. *See Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997); *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001); *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (holding inconsistencies between symptom allegations and daily activities may act as clear and convincing reason to discount claimant's credibility); *Burkett v. Berryhill*, 732 F. App'x 547, 552 (9th Cir. 2018) ("While transferability of skills to

---

[6] Defendant asserts that the ALJ also rejected Plaintiff's testimony on the ground that she had received only "conservative" treatment for her alleged symptoms. (JS 26-27.) The Court disagrees. The ALJ did not specifically find that Plaintiff's treatment was conservative and did not rely on her course of treatment as a reason for questioning her limitations testimony. As such, the Court cannot affirm the decision on that ground. *See Orn*, 495 F.3d at 630.

11

a work setting is one way in which an ALJ may consider a claimant's daily activities, an ALJ may also discount claimant testimony where reported daily activities contradict the claimant's alleged extent of her limitations."). In this case, however, the ALJ's reasoning was not supported by substantial evidence in the record.

In the first place, the ALJ mischaracterized Plaintiff's activities of daily living, apparently relying on Plaintiff's seeming ability to live on her own and take care of herself. (AR 50.) For example, the ALJ observed that Plaintiff "spends the entire day with her friends outside." (*Id.*) However, the ALJ failed to note that Plaintiff is homeless and that her ability to live on her own and take care of herself, far from being a strong indication that Plaintiff could flourish independently, was nothing more than a necessity.

Additionally, the ALJ noted that Plaintiff was able to go to appointments on her own and had established good relationships with her medical providers. (*Id.*) The only record source cited by the ALJ in support of her findings regarding Plaintiff's daily activities and capabilities, however, was Dr. Day's June 2015 evaluation. (AR 50, citing AR 898.) A fair reading of Dr. Day's report reveals that the ALJ's use of it was selective. As noted above, Dr. Day found, among other things, that Plaintiff had poor judgment in her assessment of people and situations, was not competent to manage her own funds, had difficulty showing up to appointments and in communicating with others, found it difficult to follow complicated or vague instructions, and could not remember even simple instructions for long. (AR 897-98.) Accordingly, the record does not support the ALJ's finding that Plaintiff's activities were inconsistent with her symptom testimony. *See Rawa v. Colvin*, 672 F. App'x 664, 666 (9th Cir. 2016) (finding that where "the ALJ omitted a number of salient and dispositive facts and details when recounting [claimant's] activity level," including the fact that claimant drove only a couple of times per week and the fact that she experienced pain while engaged in certain activities, "[s]uch an inaccurate representation of the record cannot constitute a specific, clear, and

convincing reason for rejecting" claimant's subjective symptom testimony); *see also Furtado v. Colvin*, No. 13-CV-04063-HRL, 2017 WL 1365208, at *3 (N.D. Cal. Apr. 14, 2017) ("An ALJ errs when he or she mischaracterizes a claimant's testimony by ignoring reports that daily activities are conducted with assistance, with great pain, or with limitation-related disruptions.").

Further, the ALJ failed to explain how Plaintiff's daily use, or abuse, of marijuana was inconsistent with her testimony regarding her limitations. *See* SSR 16-3p, 2016 WL 1119029, at *8 (S.S.A. Mar. 16, 2016); *Holohan*, 246 F.3d at 1208 ("[T]he ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony.").

Because the ALJ failed to provide specific, clear, and convincing reasons for discounting Plaintiff's subjective limitation testimony, remand is warranted on this issue.

### C. Remand for Further Administrative Proceedings

Because further administrative review could remedy the ALJ's errors, remand for further administrative proceedings, rather than an award of benefits, is warranted here. *See Brown-Hunter v. Colvin*, 806 F.3d 487, 495 (9th Cir. 2015) (remanding for an award of benefits is appropriate in rare circumstances). Before ordering remand for an award of benefits, three requirements must be met: (1) the Court must conclude that the ALJ failed to provide legally sufficient reasons for rejecting evidence; (2) the Court must conclude that the record has been fully developed and further administrative proceedings would serve no useful purpose; and (3) the Court must conclude that if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand. *Id.* (citations omitted). Even if all three requirements are met, the Court retains flexibility to remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.* (citation omitted).

Because it is not clear whether Plaintiff would be found disabled, the matter is remanded for further administrative proceedings. On remand, the ALJ should determine how best to obtain relevant medical evidence in order to determine whether Plaintiff suffers from or did suffer from a mental/emotional impairment that precludes work. That could be accomplished by a testifying doctor, a reviewing doctor, supplemental reports from treating, examining, and reviewing doctors or any other mechanism that the ALJ deems appropriate. The ALJ (and Plaintiff) might also consider whether there was a discrete period of time in which Plaintiff was disabled.

## IV.  CONCLUSION

IT IS ORDERED that Judgment shall be entered REVERSING the decision of the Commissioner denying benefits and REMANDING the matter for further proceedings consistent with this Order.

IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: August 28, 2020

*/s/ Rozella A. Oliver*

ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN WESTLAW, LEXIS/NEXIS, OR ANY OTHER LEGAL DATABASE.**